Please rise. The Honorable Judge of the United States Court of Appeals, Mr. Hurston. Court is now in session. Please be seated. Good afternoon. It is time for this gigantic case. So let's go ahead and hear first from Mr. Sobel on behalf of the direct purchaser class. Thank you very much, Your Honor. May it please the Court. My name is Tom Sobel. I represent the direct purchasers. I'll be addressing both the sham litigation piece and the so-called numerosity aspect of the class certification for the direct purchasers. I request that I reserve two minutes for a moment of time if that's acceptable to the Court. Yes. Thank you. So turning to sham litigation, objective baselessness, or so-called sham, is an issue of fact for a jury. Is there any question about that under the law? No. Here in this case, the question was whether there was substantial evidence, whether we, the plaintiffs, adduced substantial evidence from which a jury could find that GSK and Biodale had no realistic likelihood of proving that Ann Shen's generic Wellbutrin XL was free of stabilizer. And there was a full-on claim construction hearing on this and win or lose on that sort of thing. There was no indication, was there, that the Court that heard that claim construction thought that frivolous positions were being taken? Was there? I think that I followed you almost all the way until the end of that, Your Honor. But, yes, Judge Stelner, how the claims construction proceeding, he found that free of stabilizer means just that free of stabilizer, that there wasn't any question at all that there was residual HCL in the product and that, therefore, there was stabilizer in the product. There wasn't some determination that the position taken by Biodale in that circumstance had been taken in bad faith or that there wasn't a legitimate argument, was there? There was no finding one way or the other by Judge Stelner that way. And, in fact, under professional real estate investor enterprise, the so-called pre-case, as long as there's a satisfaction of a probable cause level of sufficiency to bring forth an argument, you're in a position where you can't win but for a serial petitioning position. Isn't that right? Well, I think it's true that under PRE, what the test is is whether a reasonable litigant in the position of the defendant here could realistically expect success on the merits or a probable cause standard. That is the question of fact which we think we have an overwhelming amount of evidence showing that there was evidence that there was no realistic likelihood that the GSK would be able to prove that there still lacked a stabilizer. Is it fair to say in a sort of a colloquial way that this is a straight-faced test? If you can go into court with a straight face and make an argument, you're not in a position where you could be said to be engaged in sham litigation. Is that right? No. So it's not a straight-faced test. The law requires more than that. It's a predictability test. Is there a realistic likelihood of prevailing on the merits? Not if you have just a claim or if you have an argument here or there that passes the straight-faced test or something's colorable. You've got to prove, we have to prove, that GSK had no realistic likelihood of winning that case. That's really the test. And that's more objective than a straight-faced test or a colorable, Your Honor. It's different than a colorable claim. Yes. Where do you get that from? Straight out of PRE. The PRE could have said if you have a colorable argument or a colorable claim or if you have just a mere chance, then that's enough. But that's not what that case said. But that case said there has to be a realistic likelihood of prevailing on the merits. And after that, so are you arguing it's a realistic likelihood? You're making the pitch that you've got to go in thinking my likelihood of success is better. I've got to have a better than 50% shot. Or I'm engaged in sham litigation. There's two aspects to that question. No, I don't think it's a 50%. I think it's a realistic chance. And that's all that the Supreme Court said. And I think that, therefore, it's got to be more than something colorable or a mere chance. It's also not a sham litigation. What does colorable mean? Doesn't colorable, in fact, mean this is a good fake argument? This is an argument that could win. Isn't that what the word colorable means? If that's a colorable, if colorable means this is an argument that can win the case, then yes. Colorable means the same thing as realistic likelihood. I'm not trying to play with words. Sometimes I think people use the word colorable in a much more lax expression. And it's also important to know there's two tests to the PRE. It's not just that we have to prove that it was objectively baseless, but we also have to prove that there was subjective intent to injure competition. So not every case is going to be a sham. But just to get past that objective one, I guess my question for you is wouldn't we have expected, if Bayh-Vale had walked into the Central District of California with not even a colorable claim, that there would be some hint of that on the record? Wouldn't there be something that somebody might have said somewhere along the line about, hey, we've got a Rule 11 violation here, this is a frivolous claim, or this ought to be sanctioned behavior, Your Honor, there's absolutely no basis for this whatsoever. Wouldn't there be something about that going on? Maybe. In some cases, at the end of the patent case, one of the litigants brings a claim saying this was frivolous and the issue gets litigated and the antitrust plaintiffs have to live with whatever the result was one way or the other. That didn't happen here. And I think that what happened here is an overwhelming record where we've abused evidence that the position that was being taken by GSK that there was, as a matter of basic organic chemistry, it is impossible for there not to be HDL left in this tablet and it's impossible for the HDL not to be stabilizing. So we proved, in this case, we proved that the jury could have concluded that basic science, basic organic chemistry compels the conclusion that filed bail in GSK could not ruin litigation. Now, looking at your velocity issue here for a minute, better than 90%, close to 91% of all the well-viewed track sales at issue were to the three, the so-called big three wholesalers, right? Yes, sir. And they spent, each of them, more than a billion dollars on Wellbutrin XL. Correct. Okay. So we have here, I think, what, 33 potential folks in the direct purchaser class? Yes, sir. If better than 90% of all the value of all the claims resides in three, does that, should that bear at all on the analysis that the court approaches this case with? Sure. And I'm aware, Your Honor, that you asked similar questions in another case. So my answer to that is this. There's a first-department answer to whether it should bear on anything under Rule 23A1, numerosity, but then whether it should bear on some other things. But I do think that there's something behind what the question asks, maybe. So first, under the rule, the question is whether or not it's impracticable to join all members of the class, not some, not many, but all. And impracticability is a judgment call. So, no, even though there are some members of the class, and indeed there are some other members in this class that have some substantial sales also, right? These are sophisticated parties, right? This is not what one typically thinks of when one thinks of a class action, small claims that are financially not viable unless aggregated. These are big, sophisticated players with a lot of money on the table, right? Some of them are. And then we've also got about, I would say, about two-thirds of this class don't have claims that would be worthy of being litigated on their own. And so in this case, you actually have about 20 or so class members that wouldn't be able to go it on their own in any event. And so it's also important to be mindful that both the Supreme Court and this court have looked at similar situations and said the mere presence of large claims does not defeat class. But really what I think the issue here is this. The real politic of what goes on here is the question about whether or not if there were no class, would the big three or would some other members bring their own case? And what GSK hinges its argument on is that actually they won't, that it is impracticable, even though there is some financial motivation that you would think that they would have because they have large claims. For some reason, they don't bring their own claims. And this litigant, GSK, has actually come in and said we think that some may not bring the claim. The point is they think it is impracticable for large corporations at times to bring the claim. So GSK's position is that the direct purchase or plaintiff class has met its numerosity hurdle under 23A because a firm with a billion dollars at stake won't bring a claim. Well, I think that certainly is the logical conclusion of their argument, Your Honor. But what I would say is this. What is important to be mindful of on this large claim issue is this. Under the rule, numerosity is satisfied if some members of the class can't be joined because it is impracticable for some members to be joined. So then what happens if you have some large players that are out there? Doesn't that influence the course of the litigation? Well, there may be other issues that arise. For instance, if those large players served an appropriate Rule 45 subpoena, they would have to respond accordingly, and perhaps the size of their claim might influence a Rule 45 issue. Or if I were to go to court and say to the jury, here's a class of a bunch of little players, you know, sympathize with them or implicitly do that, that wouldn't be fair. That wouldn't be appropriate. A judge wouldn't be appropriate in guiding the course of the trial to make sure that the jury understands exactly who on behalf it is. So there are other rules, there are other issues that can guide this issue about how these large players are or are not in the case. It doesn't find its way, oh, even in Rule 23. So predominance issues, there are commonality, typicality. Those issues might influence this too. It's really under 23A1 is not the ground where it gets found. And what I will say is that, which is most important, is litigating antitrust cases, it's important occasionally for the small guy to come in and to break it out and represent the class as a whole for all the purchasers. The purposes of the antitrust laws are served that way. There is no good purpose served in trying to carve out these large players. GSK hasn't found one and there isn't anything in this record about a purpose served by that. I got you. Okay. Thank you very much, Mr. Sobel. Mr. Sorensen. Yes, my name is David Sorensen. I also represent the direct purchaser class and I'll be addressing the reverse payment decision of the district court. Your Honors, I think it's important to focus on what GSK does not challenge, neither below nor here. That is that they made a large reverse payment far above saved litigation costs to their generic competitors for one purpose that they've identified. To induce those generic competitors to sign the February 9, 2000 agreements at issue, rather than do what? Launch, when they would have, in at least June of 2007, as the district court found. The district court, so are you, they say that you agree that there has to be a delay element here. That without showing delay, you don't have a case. Are they right about that? Ultimately, yes. The various parts of our case in terms of anti-competitive effects, causation, do collapse to the question of whether we can show delay. So there may be some work in parsing those different pieces, but we have to show delay and we have shown delay. At least a jury can still find. Well, let me ask a pretty general question. Let me ask this to the other side too. In the activist decision itself, the majority opinion, Justice Breyer seems to say, and I'm not trying to sit on flip here, but he seems to kind of pat people on the head and say, don't worry, but you're not going to have to get into validity and infringement stuff. You don't have to worry about that. Here we are, and, of course, the Chief Justice's dissent takes a pretty strong issue with that and says, you know, how are you not going to do that? I believe his words are almost exactly the fact. I don't see how you cannot get into it. Here we have a case where now we're faced with the arguments being pressed on us include pretty vigorous arguments about the validity or invalidity of patents, not just buy-avails, but androxes. Do we have to try to sort out validity here to understand whether or not you would have, in fact, had a case that there was delay? No. And why not? Because our theory as to the buy-avail patent is that without this payment that GHK made and does not contest, Antgen wouldn't have launched at risk as it was preparing and planning to do. They've got a patent argument against that, Mr. Sorensen. They say androx had a blocking patent, and it was a valid patent, and it was a patent that could not be challenged by Antgen because there was an assigner estoppel, and that assigner estoppel absolutely would have prevented any challenge to validity or to enforceability, leaving only an infringement case. Two responses to that. First, our primary theory as to the 708 patent is that but for the large payment that they don't contest, Antgen, Teva, and androx would have completed the license negotiations on the realm that they were already engaged in and that there would have been a license for the same terms as was ultimately agreed to. But they don't agree with that. They say, on the contrary, androx got bought by Watson. Watson had every incentive not to license. Watson had every incentive to see that Antgen was kept out so that their 180-day exclusivity expired. And, Your Honor, that is a jury question because all that they say about Watson is there was a transaction in November of 2006 between Watson and androx. There's no documents in the record about what that transaction entails, and more importantly, androx continued to license in its own name the 708 patent after that transaction. There are two licenses in the record of November of 2008 with abriga and impacts where androx is licensing after this Watson transaction in its own name, controlling the 708 patent. What they're implying is that Watson kind of called the shots over this patent. And that's not what the record shows or what a jury can find. Who owns the patent now? Who owns the patent at the time? I'm sorry. Androx was representing in multiple agreements that it had control over the patent. The abriga and impacts licenses, androx is entering into those in its own name. There's no mention of Watson. Now they say on the other side, this is just an exercise in pure speculation. It's one thing to come up with a but-for world, but, you know, I'm interpolating their words. But this isn't a but-for world. This is a purely fanciful world. There's nothing in the record to support their assertion or assumption that this deal would have occurred. What's your response to that? Severalfold. First, the two licenses I just mentioned that were both for 1%. GSK's expert admitted that Watson had no interest in delaying competition. Watson, in fact, entered in OH along with abriga and impacts. In terms of secondly, you say Watson had no interest in delaying. Isn't there a natural desire on behalf of all the generics that are standing behind the first generic to bump them out so that they can get to the market sooner and they don't have to wait the 180 days of the exclusivity period? There's an interest in potentially dislodging an exclusivity. That's what you're asking. Well, yeah. Doesn't every generic who's standing behind the first one want the first one out so they can get in? Because that six-month exclusivity, that 180-day exclusivity is worth a lot of money to the number one, but it's also delaying everybody else. What you're suggesting is other generics can replace the first five of that. No, I'm not suggesting it because that's not the law. What I am suggesting is people want to get to market and make money, and if they can knock the first one out, they want to do it naturally, and unless we're talking about people who are not engaged in profit-making activity, if they think there's a profit in being in the market, they'd want into the market, right? They do, Your Honor, but there's no record that Watson had those motivations or those interests over the 708 patent. And Andrix and Antion, to answer your earlier question, were negotiating in February of 2007 days before the February 9th agreement. There was a draft license agreement that was independent of this transaction that was being looked at and negotiated five days before February 9th, 2007, directly between Andrix and Antion. And all of a sudden, without explanation, no explanation appears in the record. That got switched into this convoluted, multi-step process where our license kind of gets passed down and eventually emerges. The same license, by the way, 1%. And so a jury can find from the record that they were negotiating until days before this transaction and that there'd be no reason for those negotiations not to continue if you remove the NOAAG. In other words, Tesla would still have an interest in taking the license from Andrix, even without the NOAAG payment. And Andrix, there's no record evidence that would compel a jury to say that Andrix, if they learned that Tesla wasn't getting paid off, would all of a sudden call a halt to these negotiations and say, well, if you're not going to get paid off, we're not going to license you. There's not a shred of evidence in the record that would suggest that that was their thinking. It's quite the opposite.  Plus the fact that there were other generic entrants that entered after all of these. There's no record of Andrix trying to use its 7-0 payment. 7-0 doesn't stop anybody. So, Mr. Sorensen, we're in a posture where a jury on antitrust grounds, with troubled damages on the line, ought to be guessing what might have happened in an alternative reality if a license negotiation had come to fruition. It's not guessing. It is standard jury questions about what would have happened that happens in every antitrust case. Before my time runs out, you also asked a question about the patent itself. Their expert, Edelman, opines that Ancient is going to win that case, not Andrix. That Ancient is going to win that case. Actually, I thought that their expert said if you combine the 80% on the infringement that Andrix would have won with the unenforceability and the invalidity risks, then you drop to something like 35%. But as GSK has pointed out, those were numbers that were focused at a party that could raise the invalidity and enforceability defenses, which Ancient could not have done, right? That was not in the record? It wasn't approved? It wasn't in the record. I'm sorry. Is it not in the record that the CEO of Ancient is the inventor of the patent that Andrix holds? He is the number four listed inventor. He's not the lead inventor. Nothing in Edelman's report even mentions estoppel. The district court rewrote the report in violation of rules. I'm not sure that that's a rewriting of the report. Is a district court not permitted to take account of legal principles? You're not saying that the signer of estoppel doesn't exist as a legal principle, are you? Well, Your Honor, I'm saying that itself is a fact-bound, legal-bound issue that gets litigated in patent cases. There was no litigation of that issue in this case. There was no motion by GSK asserting that as one of its basings. There was no argument, no briefing, no factual development. And all of a sudden, the judge says, well, you know, there's this estoppel issue. And on appeal, they say, well, our expert would have said that if we had asked him. He would have offered this opinion. Does a district court judge have to have an expert come in and tell the judge what the law is? No, but a judge should not be rewriting an expert report. It should not be just going through the baseline, Mr. Sorensen. Does a judge have to have an expert come and say, judge, this is the signer of estoppel? Or is a judge allowed to look at a factual record and say, there is a legal principle called the signer of estoppel? A judge is not allowed to grant, effectively, a Rule 56 motion that was not filed, was not briefed, and there is no factual development on it. That is not permitted, and that's what happened here. You're at stop, but I'm curious to know, what's the factual development that would have been needed here? What's the factual development associated with Ann Chen's CEO being an inventor on the Android? Well, partly it's his exact role. He's one of four inventors. GSK has referred to another inventor. On the record, there's no dispute that he's listed as an inventor on the patent, right? But in a venture estoppel law, part of the factors is the particular role of the person in the invention. Another factor is, when did the assignment happen, before or after the patent was issued? Are you suggesting that a named inventor on the patent, that there's factual development to figure out, really, how much of the invention that the named inventor was involved in in order for a signer of estoppel to apply? Yes. What's your case? I'm sorry? What's your case for that? In the case of the Bay site, we haven't briefed this issue. It wasn't briefed. That's part of the problem here, that there is no record. And when the assignment happened matters. We don't have a record on that either. There may be other facts. I can't give you a full description of that. That's my point on that. Prior to theory, there would have been a license, and the record supports that. At least a jury could still find, and that would be up to a jury. Right. Okay. I've interrupted you with a lot of questions. You have something you want to finish up? Just briefly, Your Honor. In terms of one issue that I think is very important for the court to understand, is that this so-called settlement was a jury could find a manipulation of the Federal Circuit and Hatch-Waxman, and the record would support that conclusion. And what do I mean by that? Hatch-Waxman was amended in 2003 to have forfeiture provisions so that first filers, as you mentioned, who have exclusivity can't hold on to it and block everyone else. And one of the forfeiture provisions is that if you get final approval, as Antion did, and there's no appeal pending on your patent case, you have to launch within 75 days or you lose your exclusivity. What does that mean here? It means if they had signed this agreement in February of 2007 and said, Antion, don't launch until May of 2008, which is what happened, but specify, have no pending appeal, the case is really settled, they couldn't have done that because Antion would have had to launch within 75 days of February of 2007. And they knew that and so they left the appeal pending. They also knew that if they told the Federal Circuit that, they could get dismissed for lack of subject matter jurisdiction as new. And so they didn't tell the Federal Circuit that. I understand that from your briefing. I think it's an interesting argument that the very thing they say, look, we're different because we allowed the litigation to go forward, is the thing that you think is emblematic of their bad faith. It's one more twist in an interesting case. Not just bad faith, it's what allowed the delay to occur. They couldn't have figured it out a different way. That's why they did what they did, or celebrated so fine. I have other points, but it's a well-briefed case. Thank you, guys. Thank you, Mr. Schwarzenegger. Good afternoon. My name is Peter Santoro on behalf of the Ampair Plans. With the Court's permission, I'd like to reserve two minutes of rebuttal time. Two of you, five? Yes. Okay. You got it. You're on. Three minutes it is. All right. There are two other issues, intervention and article three standing. Hold on just a moment. The clock should show three, right? He's reserving two minutes for rebuttal off of five. Okay. Go ahead, Mr. Schwarzenegger. I'm going to focus on the ascertainability ruling and the decertification ruling of the Court. The second prong of this Court's ascertainability test is that plaintiff's on the clock. Go ahead. I'm sorry. We're just having a little bit of a technical problem here. I'm sorry. There we go. We're good. All right. The second prong of the ascertainability test is that at the class certification stage, the plaintiff must come forward with preponderance of the evidence that suggests that class members can be identified in a reliable and administrative feasible way. The District Court decertified the already certified class because it found that we did not satisfy that standard. There are two points I'd like to make in connection with that. After the District Court's opinion, the Supreme Court issued the Tyson-Hoods decision, which was in our 28-J letter. And that decision addressed a very similar question, and that question was whether or not there were part injured class members that needed to be identified at the class certification stage. And the Supreme Court majority said no, that it was premature, and that that inquiry can be done after a trial before disbursement of the funds. The defendant's due process rights are accorded in that instance. Tyson-Hoods cited this court's Carrera decision and supported this rule that it was asking the Supreme Court to identify, and the Supreme Court rejected it. Can I ask you a question? Yes. The District Court gave you time to gather some discovery about ascertainability with respect to the pharmacy benefit managers, right? Yes, but no evidence in that regard was forthcoming. Is that right? No. The initial report of the defendant's expert suggested that there was capitation agreements between PBMs and third-party payers. We issued subpoenas to all the major third-party PBMs to disprove that notion. Once GSK modified its position and agreed with us that capitation was already gone by the time this class began, the capitation arrangements were not profitable for the PBMs, and they got out of that business in 2000 before the class. Once that negative was proved because it was agreed to by GSK, there was no longer any need for the PBM records. I will say that there were PBM records in this case. The native plaintiffs had their PBMs produce to them their purchase data, and so PBMs are willing to and indeed do over and over and over and over again. We cite 17 cases at footnote 8 in our opening brief of settlements where this process has actually occurred. The best evidence that it can actually happen is the settlement with the co-defendant, where this process was agreed to, information, payment information was provided, and when we put in that evidence, GSK did not seek to address that in connection with the decertification proceedings. Okay. Thank you, Mr. Steinfeld. Thank you. Do we have Mr. Wexler? I have somebody, another counsel for appellant listed. Yes? No? I'm Mr. Wexler, but in order to make things go smoothly, I had given all my time to Mr. Steinfeld, so if he has more to say, I'd like him to say it. All right. Okay. Somehow that didn't get communicated to her. All right. Then he's got to put another five minutes on the clock for Mr. Steinfeld. All right. So I get a second chance here. In connection with the ascertainability test, as to the test itself, we identified not only who are the records that we put in, but Etna itself had 138,000 unique transactions that were of record. Let me ask you about the facts on this point, too. I understood that from GSK's expert, if I've understood the record right, there was a breakdown by category, and from those categories, you say they got to like almost a 98% certainty level. Is that right? That's correct. So the question was, couldn't we identify people that had the same copayment, whether it was a brand or generic? They were excluded from the class because we said that they don't have damages in the instance. Right. Dr. Strombaum, GSK's expert, endeavored to try and figure out from Etna's data and from the large PBM, OptumHealth's data, what's the incidence of circumstances based on that one data set where we could not identify whether somebody was or was not a flat copayment. And Dr. Strombaum said it was in 4.4%. The District Court recognized that it was actually 2.2%. It was 339 records out of 15,000 to change. So 98% of the class members, based on the consumer class members, were identified as either belonging in the class or being out of the class. There was only questions as to about 2.2%. And that 2.2%, individuals can go to the pharmacies, individuals can get their plan documents. And we're talking about the consumer. That's only the consumer case, not the 2.2%. Right. What was your understanding of why the District Court, what was the predominance problem that the District Court had with taking the PBMs out of the class? Because that was one of the things put before the court, right? Right. We said that the question of whether PBMs are and how PBMs fit within the class was really a synthetic problem, and to eliminate it because PBMs are, you know, they serve as agents and payment agents for TPPs who are the ones that are at risk for the purchase. We said, look, we'll just exclude them from the class, and that will negate the problem. The District Court said in their opinion, yes, I agree, that negates this problem. But I find that there may be a Comcast problem. She didn't find the Comcast problem. She said there might be because it looks like the aggregate damage model may be overstated. I don't know what it is. And we said there are a number of problems with that. One is you have to make the finding. Two is this Court in Neal said Comcast is not a problem even if you cannot have an aggregate damage model at all. That, of course, was after this decision. So the District Court didn't have the benefit of the Neal case. And also the third point was under antitrust law, you cannot get in a buffer role the perfect measure of damage. And based upon the record that we had here that this PBM issue was de minimis at most, even if it was credited, then our damage model was not necessarily faulty. All right. And it could have been corrected. Okay. Thank you. Thank you very much, Mr. Sanko. All right. We'll hear from GSK, Mr. Kastenberg. Good afternoon. May it please the Court. My name is Stephen Kastenberg. I am argued on behalf of Applee Glaxus McClain. I will address the issues of sham litigation and resource payment. My partner, Ms. John, will address the class certification issues. In two carefully reasoned, thorough, 90-page opinions, the lower court found the plaintiffs suffered from failures of proof, both as to their sham litigation and their reverse payment cases. Those decisions are correct and should stand. I will first address sham litigation. Why don't we not address sham litigation first? Let's talk first about reverse payment, okay? On the reverse payment issue, it seemed that the court had a couple of alternative grounds. One was to say there was no delay. Among other reasons, there was no delay because there was a blocking patent from Andrews, therefore no injury, no Clayton Act claim. Also seemed to say even if there had been delay, the pro-competitive effects outweighed the anti-competitive effects, and no reasonable jury could have found otherwise. Why don't we start with the second of those, and then I'll steer you back to where I was with Mr. Schwartz and if my colleagues will let me do that. Assume that the blocking patent was off the table. Isn't the weighing of the pro- and anti-competitive effects something which is classically done by a finder of fact? I don't think it needs to be at all, Your Honor. There are many cases outside of the antitrust context or within the antitrust context where courts are asked to apply multiple factors to determine whether liability has been met, and courts will award some re-judgment in those instances. The question is, is the consumer welfare impact, is the pro- and anti-competitive impact, aren't they questions of fact? I think that they can sometimes be questions of fact, Your Honor, but I don't think that they are necessarily questions of fact. Are you standing on the judge's ruling because she was determining questions of law, or are you standing on it because she correctly found that no reasonable jury could have found the other way because she seemed to think that she was making a determination about fact. Otherwise, why couch it in the terms of no reasonable jury could find? I think that she did find, Your Honor, stating correctly that no reasonable jury could find in these unique circumstances, that the pro-competitive benefits did not outweigh any anti-competitive harm. It's necessarily the case that she understood, the district court understood what was before her as a jury question, and she was taking it away from the jury because she thought it didn't need to go to a jury, because it was so obvious. That's what happened, right? I don't think I would couch it that she recognized that it was a jury question. Why else would you say, Mr. Kastenberg, no reasonable jury could find this, unless it was in fact the case that this was going to go to a jury, and now it's not because no jury could find the other way? Because it is a balancing, and I acknowledge that, Your Honor, but just because you have a balancing test, if there's no evidence that is proper, that there's insufficient evidence to create a question that a reasonable jury could find one way. And when we talk about – I get back to the two unique facets of this case. One is the blocking patent, but the other, which comes in, in particular, on the balancing, Your Honor, is the issue of the early trigger, the fact that the settlement kept the patent litigation alive. And when you look throughout activists and you look throughout Lementhal, over and over, they are, in most cases, identifying that the antitrust concern to the Supreme Court and to the Third Circuit and Lementhal is the, quote-unquote, buying off of the patent challenge. Isn't it the buying of delay? It's not just the buying off of the challenge. It's the buying of delay. That's the problem, the antitrust problem. And rightly or wrongly, I mean, you can certainly say a lot to criticize the majority's opinion in activists and a lot of angst in still doing that. But it is what it is, and what it says is that it is bad for the consumer to have delay, and that's what activists is about, and that's what Lementhal is about, and that's what this case is about, as you've argued and they've agreed with you. The issue is the delay, right? I think, honestly, I think both, Your Honor. And I do think that when they get out of this argument, even if you disagree with my view on what the antitrust concern is, and I'm happy to quote to you from Lementhal, which itself is citing activists and quoting activists, which says, quote, it is the prevention of the risk of competition, i.e., eliminating the risk of patent invalidation or refining of non-infringement by paying the challenger to stay out of the market for longer than the patent strength would otherwise allow that constitutes the relevant anti-competitive harm. Precisely, by paying them to stay out of the market. That's just a wrong way of saying delay. Well, I agree, Your Honor. At the end of the day, if you disagree about the point that this settlement addresses the anti-competitive harm, which I think you can also look at as the patent challenge being dropped, then you do get back into delay and the plaintiffs acknowledge, and that's what Lementhal also says at the end of the day, at the end of the opinion when it's talked about, it says, in this context, proving anti-competitive harm means proving delay. So I do acknowledge that. Yeah. So focus now on the delay aspect. And if we were talking about pro versus anti-competitive effects, usually when you look at the activist opinion, it starts talking about it specifically. If you're talking about weighing the two sides against each other, you would sort of expect that the things that would be moving between the negotiating parties in response to I give you money or I give you a no AG agreement is something coming from the other side that the court could look at and say, well, that coming from the generics, that's something which is ultimately going to benefit the consumer. There's a pro-competitive thing there. Here, it looks like everything is going from, not everything, but most everything is going from GSK to the generics. The consideration is flowing in that direction. So how would we look at that and say, oh, that's pro-competitive? Instead of looking at it and saying, just as your opponents do, that's all cooked up. That's meaningless. That's just more stuff to sweeten the pot for the generics and increase the likelihood for delay. I may have asked that question badly. I think it was two very different contexts, and we need to keep them separate. One is, have the plaintiffs met their version of proving anti-competitive harm and antitrust injury? Have they proven delay? Have they created a triable question of delay? The other is the balancing, and that's the part I'm trying to get you to focus on right now, that second piece. I understand your arguments about no delay, and we'll talk about those in a minute when we talk about the blocking pattern and other things you want to talk about. But right now I'm focused on one of the alternative arguments that Judge Malafa made, which is there's no reasonable jury could weigh this stuff out and say, oh, the anti-competitive harm outweighs the pro-competitive harm. Nobody could look at that and say that. And I'm trying to get you to wrestle with something I understood them to be saying, which is these supposedly pro-competitive things, that's a bunch of nonsense. That was all Phil Sweetner's from GSK on the other side. Why don't you take that on? I guess I don't understand how you can say that these are pretextual or just Sweetner's. When we talk about one of the pro-competitive aspects, number one, there was a backup supply provision. Which was going from GSK to TEL. Well, it's actually a BioVail settlement, and BioVail was the only manufacturer of wellbutrin XL. And they were committing to manufacture it for Antgen, who was the manufacturer for TEL. And it goes from the branded drug to the generic, right? It's a support to the generic. It is a backup supply, and the unrebutted evidence is that Antgen was a new company that had never launched, and that there are email dialogues between TEL and Antgen where TEL is concerned about Antgen's ability. So there's a real non-pretextual value to that backup supply. How is it maybe pro-consumer, how is it pro-competitive? How is it something that would not have existed but for what you were doing? How does it add to competition? That's what I'm trying to answer. Well, TEL and Antgen can't launch unless they have an adequate and comfortable supply. We're talking about a prescription drug with true suppression. First of all, you have to have enough product to launch. Second of all, you have to be able to continue to manufacture the product because your customers can't have an interruption of supply, and there's evidence in the record of this. But how is that pro-competitive? It is pro-competitive because for Antgen and TEL to be able to launch, they have to have an adequate comfort and ability and have this insurance policy, so to speak, that the supply will be uninterrupted. What happens if they don't launch? If they don't launch, then there's no generic on the market. There's less competition. No generic? If they fail to launch within a certain period of time, what happens? Well, in TEL and TEL, there's no generic to launch. Right. So if they activate, it's a later game. If they don't launch, somebody else comes in, is that right? Eventually. There's no evidence in the record that that would have been as soon. The only evidence is that those other launches would have been later. So it was earlier entry, so that's the backup supply. And, again, there was also still the citizen petition that was out there, and there was litigation over it, and that had to do with what were the standards that Antgen had to meet. When was the citizen's petition matter resolved? I think it was resolved before the settlement. There were two parts of it. The FDA had denied in part and granted in part the citizen petition before the settlement, but there was pending litigation in the federal court challenging the aspects of the decision that denied. Okay. And I think we cite at least one case where that kind of litigation can succeed. So it was still an open issue, and it was an issue that TEL had cared so much about, that for the regular backup supply, they negotiated. This was very hotly negotiated. I think there were nine drafts back and forth on this one point, and TEL agreed ultimately to a $75 million tablet cap, except in the instance of if the citizen petition prevailed and there were regulatory changes, there was no cap. Does the history of negotiation matter? Does that tell us things that we ought to be paying about when the different parties are negotiating different things? Well, I think here it evidences that this was a real and nonprotextual issue. Both the hotness of the negotiation and the internal e-mails between TEL and Anshan reflecting the concern by Anshan's ability, and frankly, the regulatory issue that Anshan has with FDA. Anshan is so inexperienced, they're ready to launch from a facility that they don't have FDA approval for. These are emblematic of the problems of a new company. How about if we just shift over then to the blocking patent piece? And go ahead now, we've talked about negotiations. Respond, if you would, to Mr. Sorensen's point that there would have been a license. There were negotiations. They were on the verge of having a license. And if we're going to pay attention to what you're talking about, that look at these licenses, these negotiations, that's important over here, why shouldn't we be paying attention to that over in this area where they say there was going to be a license, so this blocking patent stuff is not significant? Because, Your Honor, there's simply no evidence in the record to support that, nor is there any expert testimony. I want to walk through the record. Yeah, please, because when you say there's no evidence in the record, he said there's evidence in the record of the negotiations happening right up to the end. And I want to address that, Your Honor. Okay, please. And I think the best thing to do is to take it chronologically. So, Washington, Andrew X. Chu's Glaxo in 2005, and they go through full discovery, there's motions for summary judgment pending. Then in the fall of 2006, Watson, which, as you know, has an ANDA pending, origin out of form of World Region XL, acquires Andrex. Three weeks later, Andrex sues Anchin, seeking a preliminary and permanent instruction. Thereafter, Your Honor, that's in December, in mid-January, there's uncontroverted evidence that GSK is negotiating a settlement of the Andrex litigation and that part of the package for which it is paying includes the requirement that Andrex provide a license to Kevin Anchin. In particular, there's two emails, one which is cited in our brief and one which is not, but is responsive to the reply brief and is in the appendix. The first, Your Honor, which is in our brief, is a January 14th email between GSK's lead negotiator, George Carey, outside counsel, to the general counsel of BioBell, Rich Agossi. And there's a back and forth over a couple of days in which it is crystal clear that George Carey is negotiating the deal, including for Kevin and its partners, as we'll refer to, and he keeps saying to Rich, have you consulted with your partners? We need to hear from T, which is Teva, about this position and that position. And at one point, there's even a testy exchange where Rich Agossi says, well, to George Carey, quote, we have all been operating under the assumption we would have freedom to operate, including as to the Andrex patent. So George Carey, for GSK, is negotiating. BioBell is writing in, excuse me, I misstated this. This is an exchange between Teva's general counsel and George Carey. So Teva's general counsel, George Carey is saying to Teva, consult with your partners, consult with AMC and IMPACT, and get back to me. I need to know what will be acceptable. We're negotiating this whole package. We're paying this consideration. And Teva is saying, we have all been operating under the assumption we would have freedom to operate, including as to the Andrex patent. Now, the other document you're on is the whole thing. Hold on just a second. So are you saying that it's not the case that there was negotiating going on independent of GSK negotiating the overall global settlement? There is no negotiation at all at this point in time, and there is never independent negotiation. But I will continue to walk you through the timeline. Two days later, there is an email, and this is what I was thinking of, between George Carey, again, GSK's lead negotiator, and the general counsel of BioVale. And I will give you the appendix, because, again, you don't cite this in a brief, and it is JA14645. And, Your Honor, this sets forth from GSK to BioVale what the agreement and principle is that GSK has negotiated with Andrex. And it has six enumerated items in this one-page email. It says there's going to be an immediate license to GSK from Andrex for a branded drug. There's going to be an immediate license for a potential authorized generic, an unbranded drug from GSK. And then it says, number three, commitment that Andrex will license TEMBA-slash-ANCHIN-slash-IMPAX, those two brands, one generic seller, because it's operating as a package, for entry on May 30, 2008, or the date of the Federal Circuit Affirmation of the District Court decision in BioVale-versus-ANCHIN. So, as part of the deal, the GSK has negotiated. Number three is the commitment that Andrex will license TEMBA. And number four, it says we're going to pay back royalties immediately promised in the store of $30 million. And number five, Your Honor, is a long-term payment of $5 million from GSK to Andrex. We don't have to get that deep in the weeds on what this email says. I'm just trying to get at one thing, Mr. Kastenberg, which is your opponents have made the assertion right there at that podium that there were negotiations, and the implication I took was that there were negotiations, independent of the global negotiation that GSK was engaged in, that would have led to a license. Now, I just need to know from you. Are you saying to me that there isn't anything, that that didn't happen, and that there's nothing in the record to support that assertion that I'm hearing from the director? That's exactly what I'm saying. By mid-January, Your Honor, the email traffic shows that GSK had negotiated a license, had paid a lump sum to obligate Andrex to license the TEMBA. So, at the end of January, Your Honor, what he's referring to is that all these agreements are signed February 9th. There's 24 agreements involving every aspect of this, and they're all signed on the same date. The biovail, the releases, the licenses, including the Andrex settlement, it's all signed as a package. And five days before that, what he's referring to is there is a short period of time where, pursuant to this overall agreement and requirement that GSK has negotiated, GSK and Andrex talk directly.  In the context. Here's my question. They seem to be saying that the judge went off the reservation because, as an alternative basis for finding a summary judgment appropriate, she said there's a blocking patent. And in the course of doing that, she implicitly made a finding, for example, that there was not going to be something like this, a license. In other words, you seem to be saying here's a factual record, and we've just spent a substantial portion of your time hearing about a factual record. They're arguing this is fact-bound, and whether there would have been a license or not is something that should have been developed in the district court, not something that you ought to be arguing about on appeal. What's your response to that? My response is that they deposed Teva, they deposed Inch, and they developed no record. When there is only evidence on one side, the plaintiffs have a failure of proof. Are you saying that the only evidence they came up with of this direct bilateral negotiation, alleged direct bilateral negotiation, is the February 4, 2007 email that references the overall deal process, subject, of course, to the overall deal process? By mid-January, the underbarred record is the GSK had already struck a deal. There are details to be worked out. There's a February 4th exchange, only five days before the very complex agreement. And it's an exchange that says, as I said, it's subject to the overall deal process. There is no evidence on the other side. I would expect what I would hear back from them, they'll speak for themselves in rebuttal, but what I would expect to hear back from them is, to the extent there was a lack of development in the record, maybe that's because GSK never made the argument that Andrux had a blocking pad. Maybe it's because this came out of the district court in the first instance and was not something that was argued before the district court, because they never came to the court and said, here's an independent reason for you to find that there was no delay. There was a blocking pad. That's what their pitch that were made just a few minutes ago. Is that accurate or not? Did you make that argument to the district court? It was truly briefed in summary judgment, Your Honor. As anything before that, they were the plaintiffs. They had the obligation to come forward and prove their case. The blocking pad was argued and the assertion about the Assigner-Estoppel argument, all that was in front of her. All of that was fully briefed, Your Honor. I did hear what my brother said on that. It was all fully briefed by both parties. It was argued in a four-hour summary judgment argument. You put the Assigner-Estoppel issue before you argued it. The other side had the chance to come forward and argue it. It was absolutely front and center. You didn't see below it, and you don't see it in the briefs now. And even when they say Assigner-Estoppel, it doesn't apply. The fact is, the 36th witness for Teva, whom I deposed and whom Mr. Sobel was there deposing as well, he said we, Teva, were concerned about Assigner-Estoppel being used against our business partner, Inchen. That was during discovery, under my questioning and under Mr. Sobel's questioning. They were fully unnoticed, and the burden is on them to develop these issues. So, I mean, there's no argument in the brief before this Court that Assigner-Estoppel does not apply. And the fact is, as Your Honor noted, I mean, it is their burden, even if we didn't have Professor Adelman, it is their burden to come forward to prove that the in-index blocking patent wouldn't have prevailed. The fact is, we do have Professor Adelman. He's unrebutted. He has a very clear conclusion of 80% infringement. He was only addressing, as he says in his report, he was only addressing the issues that had already been raised in the in-index litigation. Assigner-Estoppel is a defense. It had not yet been raised by Inchen. It hadn't had an opportunity to do so. The Court did nothing wrong at all. It was clear on the surface of Professor Adelman's report that there was an 80% chance of prevailing on infringement. It's unrebutted. It's a federal circuit, not some piece of evidence that says that Assigner-Estoppel applies. And they deposed Inchen. They had every opportunity to develop whatever information they wanted about the in-index law. So Inchen's views on it, Inchen's views on Assigner-Estoppel, and they never did, Your Honor. I mean, does the Court have any other questions? No? Okay. Thanks very much, Mr. Kassenberg. We do have some for your colleague, Ms. John. Thank you. Good afternoon. May it please the Court? Leslie John, on behalf of Appellees and Cross Appellants, I was going to start with the ascertainability issue unless you would prefer that I start with numerosity. No, let's do start with ascertainability. And your own expert on the consumer side seemed to indicate, you know, when you sussed the numbers out that maybe 2.2% you'd have a hard time figuring out. If you've got close to 98% ascertainability, why isn't that good enough? All right. And I did hear you ask those questions. And so what our expert said, and this was Dr. Strombaum, and if you look at Exhibit 9 to his report is the exhibit that encapsulates these numbers that we've been discussing. What he said is if you look at the data of Aetna only, and if you recall, Aetna is one of the named class representatives. Aetna is somewhat unique. The industry expert of the indirect purchaser plaintiffs, Mr. Debris, testified that Aetna is a very unique entity because it is both an insurer and a PBM under the same roof. So they have much more sophisticated data available than your average third-party payer, which makes up, in fact, the majority of the class, and the majority of consumers are insured by these other entities. Where does the district court talk about that, Ms. Vaughn? Because the district court seemed to focus down on these numbers and not on other numbers, but on these numbers and say not good enough. Okay. Isn't that a little unusual when you get to 98%? Well, I don't think you get to 98%, and I'll address that first. If you look at Dr. Strombaum's report, what Dr. Strombaum says is flat copayers as consumers are not part of the class. So if you take the flat copayers out of the class, these are people who pay the same amount irrespective of what they're getting at the pharmacy counter, and then you look at the remaining claims of the consumers, what you find, in fact, is that upwards of 38% of them, even with as sophisticated a database as Aetna, are unclear. And the reason why they're unclear is because you look at the data. It doesn't match is it a flat copay, is it coinsurance. There's an amount that makes no sense in the database. When you say we take out the ones, I mean, I get the feeling that there's a little bit of, you know, there's a guy in a black robe who's bad at math thing going on here, which is probably true, but don't you have to include them in your bucket? When you're figuring the math and you're looking at it, part of the ascertainability is knowing who's covered and who isn't covered. If you start saying, and now we'll take all the people who are uncovered out and only look at this, you may increase the percentage of people as to which you'd say we're not sure, but if you look at it all together, you're still at that 2.2%, aren't you? I mean, you may say some people are covered and some aren't, but that's not the same as saying ascertainability. Ascertainability is do I know whether you're covered or not? And I think on this record, what the plaintiffs came forward and failed to do is they served discovery on, they asked the court, after we filed a Motion D certified, the plaintiffs came in and said to the court, we need a period of discovery. They served subpoenas on nine PBMs, which are the largest PBMs in the country, as well as one of the largest retail pharmacies in the country, and they asked for data on transactions. And we heard from Mr. St. Philip's, and that's a different issue, right? The PBM piece, I'm just looking at the consumer part of it here. But it would also have given you information, Your Honor, about consumers. Can we tell from the information that insurers keep, that PBMs, that pharmacy benefit managers keep, and that retail pharmacies keep? Because if you recall, consumers will go to their retail pharmacy for records. Can we tell if this class is ascertainable? All we know is what, and no records, not a single record was produced in response to any of those subpoenas. So the other side says, you know what, take the PBMs out. And the district court says, yeah, that would solve that ascertainability problem. Now I've got a predominance issue. How do you defend the district court's assertion that there's a Comcast problem when there's virtually no analysis of what the Comcast problem would be? How you defend that is you go back and you look at, this court heard the original certification proceedings. They were based on an expert report of Professor Rosenthal that looked at and said, I can opine that there is impact and damages across the class. And if you look at the model that Professor Rosenthal used for impact and damages, it was built on the prices that PBMs were paying to retail pharmacies. That is the basic building block of the model that Professor Rosenthal used. And so this court asked the plaintiffs, this was asked during the hearing on decertification, if I take PBMs out of the class, is this model still valid to show, in fact, impact and damages across the class? And when Professor Rosenthal was asked that at her deposition, she said, I don't know how I would come up with a model that would be capable of showing impact and damages across the class because my only model is dependent on information about what PBMs are paying retail pharmacies. Did any of that show up, Ms. John, in the district court's opinion? I do believe that she cites to Professor Rosenthal's testimony. This is a citation, but is there analysis? Is the analysis that you just laid out of why there would be a problem in the district court's opinion? And if it isn't, is it a defensible thing to say there's a predominance issue, so you lose anyway? I think it's defensible because if you look back at what is the burden of proof to plaintiffs under Rule 23, it's incumbent on the plaintiffs if they want to, in the 11th hour, fundamentally change the class definition to satisfy each and every one of the requirements of Rule 23. The burden always remains with the plaintiffs to do that. Having fundamentally altered the class definition, they didn't come forward with a new model to show impact and damages. And so at the end of the day, the district court is left without any evidentiary record to support any of the requisite findings under Rule 23. Can I ask, if my colleagues allow, although your time is up here, a numerosity question. You heard the argument and the question that I asked of Mr. Sobel about the big three and the 33 people in the direct purchaser class. What is your response to his answer to me that there was not a showing that joinder of all people, well, there wasn't a showing with respect to the impracticability of the joinder of all people, et cetera. What's your answer to that? My response is the plaintiffs have the burden under Rule 23A to show that joinder is impracticable. In a case where you have three members of the class that each have a billion dollars in purchases, and recall the total damage amount in this case is $10.4 billion. I'm with you on all that, and I'm trying to direct you at a specific thing. The specific thing I understood him to be saying was there are these other 30 folks, and although he didn't say it, I understand from the briefing, there's wide geographic diversity, there's a number of claims which are small enough that in expensive litigation like this, it wouldn't be economical to handle it. Those are the sorts of things that do make it impracticable to join these people and make the class mechanism the right tool to use. I understood that to be the argument both from the briefing and from his presentation, and I'm trying to get you to respond to that assertion that numerosity is the wrong judicial tool to use. What's your response to that? I think it's the right judicial tool. First of all, there's really no showing here. Why is any plaintiff prohibited from going into court? None of these are small companies. The supposed smallest member of the class, in fact, opted out. So there's simply no showing that these parties can't come to court, that venue would be inappropriate, that they wouldn't have jurisdiction. We see every day in antitrust cases where there are multiple plaintiffs, why they can't join together. They're entitled under the Sherman Act to treble damages and costs if they prevail. To say that somehow they wouldn't have an adequate incentive to come to court and to be subject to a Rule 45 subpoena, which is what I heard Mr. Sobel say, is somehow suffices for having to actually show up in court and state your claim. I don't think those are analogous at all. As a defendant, GSK has a right to confront, as a party, these entities with billion-dollar claims that can now hide behind this class defiance. I don't think serving a subpoena somehow is a magic cure-all, and I don't think they've shown anything more than minor inconvenience in joining together in any district court to bring their claims. I don't think they've shown any obstacles or any difficulties, true difficulties in doing so.  Thank you, Your Honor. Thank you, Ms. Jones. Mr. Sobel? Two points regarding the numerosity issue, then, Your Honor. The first is this. It is the case that the Rule says it has to be joined of all members, not some members or whatever. So the real question is, what about the other 15 or the other 20? Can they be joined? And as you pointed out, not only is there geographic diversity, they're in 15 different states, all 33 members. So no one knows whether or not they're all going to decide to just file in the same place or file in different places. They may file at different times. Sure, there are other judicial tools for litigation, 1407, 1404, collateral estoppel. They all have their strengths. They all have their weaknesses. Judge McLaughlin did not abuse her discretion in making a factual finding, which this court would have to overrule as an abuse of her discretion, that it was impracticable, a judgment call, to join these classes. Also on the Day 3, let's just make it clear. They're not free riders, particularly in this case. They're bound by the judgment. They did not opt out. They agreed to be bound by the judgment, and right now there's a judgment. But they didn't show up. They're not at the table. They're not subject to the full panoply of discovery. Answer Ms. John's last point, which is we ought to write. If somebody's got a billion-dollar claim against us, you know, they ought to show up and they ought to fight their claim and they ought not be, as she put it, hiding behind the classified case. And there's nothing in this record anywhere that GSK sought discovery from them that it was denied. In fact, quite the contrary. The record shows that they're in the case, they're bound by a judgment, they're going to be, if these judgments are affirmed, they're out because they agreed to be bound by the case. And as I indicated earlier, if there are unfairnesses, they're to be addressed through other more particular rules, not by trying to throw out the class mechanism because you've got large players in the class. It's been decided before this court should follow that. Thank you. Thank you, Mr. Sobel. Mr. Sorensen. Yes, Your Honor. I'd like to draw your attention to a back-and-forth that happened in the briefing below. In our brief on summary judgment, it's ECF 588 at page 96, we state as follows, quote, understanding that Andrews could not prevent their generic launch, Teva and Anchin were perfectly capable of securing the license to the 708 patent without any purported help from GSK. GSK said in response, this is in the record at JA2723-24, and I quote, this is GSK's direct response, quote, similarly, plain to sight, a series of e-mails, you've heard of them, spanning the time period January 24, 2007 to February 4, 2007, for the proposition that Teva was, quote, was close to obtaining the license directly from Andrews and did not need GSK's, quote, help. Plaintiff's opposition, 96. This misses the mark entirely. GSK has not argued that Teva needed GSK's help to obtain a license from Andrews. GSK has not argued that Teva needed help. That's what they said below. Now they're switching completely and saying, no, no, no, no, you don't understand. They did need our help. It's not just that we sort of helped them, it's that without our help, their claim is, plaintiffs, you can't prove there would have been a license. But that's not what they said below. And statements and briefs can be binding judicial remissions. We cited that. We rely on it. It's in the appendix. They have no response for it. In their brief here, they said, well, we were just quoting plaintiffs. There's a couple of, you know, small quotes where they quote our language, help. The rest of what I just read is their statement about their position. And that was their position. And now they're completely flipping it and saying, no, no, no, without GSK's no AG payment, that's their position, Teva would have stopped being interested in a license and Andrews would have refused to give it. That's their claim. Now, Ms. Bauer, you have other evidence of direct bilateral negotiations besides that February 4th e-mail. We have the witness for Teva, who is Ms. Bauer. She was a 30B6 witness for Teva who was deposed, and she was asked about the February 4th e-mail and was asked a question. This is on page 235 of her deposition. This is JA28163. In effect, quote, Teva was already negotiating independently with Andrews, wasn't it? Question. Answer, I think it started out that way, but then during the course of the negotiations, turned into a sublicense from Biola. She needed it. We acknowledge that. It got turned into this convoluted, multi-step thing. But she's testifying that there were discussions. The key question that I think is at root is that February 4-7, there is this direct communication between Teva and Andrews. February 9th, there are these agreements. The question is, if on February 5th, let's say, let's say there are two rooms, Tevas and two rooms, negotiating trying to get a no aging payment and trying to get this license. The question is, on February 5th, the next day, if GSK said, you know what, forget the payment, we're not going to pay you. We're not paying you, right? Does Teva go back into the room with Andrews and say to Andrews, you know, we're not getting paid, we're not interested? That makes no sense whatsoever. But Andrews, Andrews says, oh, you're not getting paid? We're not going to give you a license. No evidence of that, no hint of that in the record. It makes no sense at all. It's contrary to Andrews' behavior. That's the question for a jury. What would have happened? Because we want the no aging payment taken out, and we want the jury to figure out what would have happened to a reasonable degree of certainty, you know, what a jury does all the time, what would have happened? That's the question. Okay. Well, we've got the – I had more, but – Yes, but there's a whole lot of paper, there's a whole lot of argument. We appreciate the argument. It was well presented, and we've got the case under advisement. Thank you, Mr. Sarson. Thank you. Well, I'm going to – yeah, thank you very much. This is a case that needs a transcript. We'll ask the parties to get together and arrange to have a transcript of what our argument produced. Thank you. We're going to recess. All right. Thank you. Thank you. Thank you.